IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )  Case No. 4:24CR35-2 (RCY) |
| | ) |
| LEAH TAYLOR MCLEOD, | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Leah Taylor McLeod's Motion to Suppress (ECF No. 53). The Court conducted a hearing on the motion on October 31, 2024, at which time it heard evidence and took argument from the Defendant and the Government. For the reasons stated from the bench and as more fully set forth below, the Motion to Suppress is denied.

**I.  BACKGROUND**

**A. Procedural and Factual Background**

The instant motion stems from a superseding indictment charging the Defendant with Conspiracy to Possess with Intent to Distribute Five Hundred Grams or More of Cocaine and Possess with Intent to Distribute Four Hundred Grams or More of Fentanyl, in violation of 21 U.S.C. § 846; Possession with Intent to Distribute Five Hundred Grams or More of Cocaine, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B)(ii), 18 U.S.C. § 2; Possession with Intent to Distribute Four Hundred Grams or More of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A)(vi), 18 U.S.C. § 2; and Maintaining a Drug-Involved Premises, in violation of 21 U.S.C. § 856(a)(1), 18 U.S.C. § 2.[1]  ECF No. 30.

---

[1] The superseding indictment also names co-Defendant Dajour Dominique Pemberton. Mr. Pemberton similarly moved to suppress the evidence described herein, *see* ECF Nos. 49, 50, but he withdrew those motions concurrent with his decision to enter a guilty plea, ECF Nos. 68, 71.

On January 15, 2024, Newport News Police ("NNPD") responded to a 911 call at 107 Creekshire Crescent, Newport News, Virginia ("the Creekshire Address"), regarding a domestic dispute. Mot. Suppress & Mem. Supp.[2] ("Mem. Supp.") 1, ECF No. 53; U.S. Resp. Opp'n to Defs.' Mot. Suppress Evid. ("Gov't's Opp'n") 2, ECF No. 63.[3] The caller, Defendant Leah McCleod, told the operator that her boyfriend, co-Defendant Dajour Pemberton, who resided with her, was threatening her with a firearm. Gov't's Opp'n 2, 5–6. Officers ran Mr. Pemberton's criminal history, which revealed multiple prior weapons offenses, including a 2022 conviction for felon in possession of a firearm. *Id.* at 2; Mot. Supp. Ex. A ("Residential Warrant") 5, ECF No. 57.

When police arrived at the scene, Ms. McLeod and Mr. Pemberton answered the door. Gov't's Opp'n 2–3. Ms. McLeod held two phones: a purple phone in a glitter phone case, which she held to her ear as if on a call, and one with a black phone case, which she held in front of her as if on FaceTime. *Id.* at 7. Police immediately detained both Ms. McLeod and Mr. Pemberton in front of the house, as well as Ms. McLeod's six-year-old daughter. *Id.* at 2–3. Ms. McLeod and Mr. Pemberton were both handcuffed and patted down for weapons. *Id.* at 7. While doing so, officers placed both phones in the grass. *Id.* When asked who owned the phones, Ms. McLeod stated that both phones were hers. *Id.* Aside from the phones held by Ms. McLeod, neither Ms. McLeod nor Mr. Pemberton had anything on their person. *Id.*

Simultaneously, police conducted a protective sweep of the property. *Id.* Officer Hopkins walked behind the home to secure the perimeter. *Id.* at 2. While there, he spotted a black backpack

---

[2] The Defendant filed a single "Motion to Suppress and Memorandum in Support," rather than a standalone motion and separate supporting memorandum.

[3] Both parties' factual recitations agree on the material underlying facts. For the sake of simplicity, and because it is the most comprehensive, the Court cites solely to the Government's Opposition for much of the Factual Background.

2

in the woods past the backyard. *Id.* Officer Hopkins then assisted other officers with a sweep of the house. *Id.* at 2–3. No other occupants were found, though the police did recover a 9mm cartridge in the laundry room. Residential Warrant 5.

While conducting the sweep, Officer Hopkins noticed that the backdoor was open and walked onto the back porch, where he "noticed a single set of fresh shoe prints going from the back door to the edge of the porch and returning to the door." Gov't's Opp'n 3. The shoe prints appeared to match the shoes worn by Mr. Pemberton. *Id.* Officer Hopkins walked beyond the shoeprints to the backpack he had spotted in the woods earlier, wherein he discovered "partial bricks of cocaine and fentanyl, approximately $3,000 in cash, a digital scale, and plastic bags." *Id.* at 2–3. Five feet from the backpack, he discovered a handgun partially buried in leaves and dirt. *Id.* at 3. Once the protective sweep was complete, officers removed Ms. McLeod's handcuffs, allowing her and her daughter back in the home. *Id.* at 2, 7. Mr. Pemberton, however, was kept outside for further questioning. *Id.* at 2–5.

Once inside, Ms. McLeod sat at the dining room table, where officers placed both cell phones. *Id.* at 7–8. The purple phone "activate[d] several times with what appear to be both calls and other notifications. . . . Ms. McLeod look[ed] at, but d[id] not touch the phones" until 11:03 p.m., at which time Ms. McLeod picked up the purple phone and began to use it. *Id.* The attending officer, Officer McKay, informed Ms. McLeod that she was detained and could not be on her phone. *Id.* Ms. McLeod returned the phone to the table. *Id.*

Meanwhile, the discovery of the suspected drugs in the backpack prompted the officers to call Detective Stewart from the Gang Enforcement Unit. *See id.* at 3–4. At 11:41 p.m., Detective Stewart began questioning Ms. McLeod. *Id.* Detective Stewart informed Ms. McLeod that "he [wa]s there investigating drug possession and firearms offenses," and that "dangerous drugs" had

3

been found.  *Id.* at 4.  Ms. McLeod refused to respond, and the two sat in silence for approximately four minutes before Detective Stewart left to speak with Mr. Pemberton.  *Id.*

Outside, Detective Stewart interviewed Mr. Pemberton.  *Id.* at 4–5.  Detective Stewart informed Mr. Pemberton that officers had discovered a "bookbag" filled with "dope."  *Id.*  Mr. Pemberton denied knowledge of the bookbag and asked: "What type of dope?  You talking about marijuana?"  *Id.*  Detective Stewart clarified that the suspected drugs were "heroin and coke."  *Id.*  To this, Mr. Pemberton stated: "If I'm going to sell something, to keep it real with you, if I'm going to sell something, it's some f\*\*\*ing weed."[4]  *Id.*  For the remainder of the conversation, Mr. Pemberton continued to deny knowledge of the backpack and the drugs within it.  *See id.*

At 1:48 a.m., while waiting for search warrants to issue, Officer McKay began placing the phones in evidence bags and asked Ms. McLeod: "So, sparkly case is yours, the black one's his?"  *Id.* at 8.  Ms. McLeod did not verbally respond but "appear[ed] to give a single head-nod of confirmation."  *Id.*

**B. Warrant Contents**

While officers were still at the Creekshire Address, NNPD sought warrants to search the home and both cell phones.  *See generally* Residential Warrant; Mot. Supp. Ex. B ("Black Phone Warrant"), ECF No. 57-1; Mot. Supp. Ex. C ("Purple Phone Warrant"), ECF No. 57-2.  Officer Granville swore out the residential warrant and Officer Hopkins swore out both phone warrants.  Residential Warrant; Purple Phone Warrant.

---

[4] The substance of this statement is the subject of great debate in this matter.  The Court refers to the statement as Mr. Pemberton's "marijuana statement."

4

1. Residential Search Warrant Contents

The residential warrant affidavit requested permission to search for evidence of marijuana distribution, ammunition, and firearms.  Residential Warrant 1, 3.  The affiant—Officer Granville—described the underlying 911 call, the detention of the Defendants, and the discovery of the 9mm cartridge.  Residential Warrant 5.  Officer Granville made two assertions in support of probable cause with which the Defendant takes particular issue.  First, in describing Detective Stewart's conversation with Mr. Pemberton, Officer Granville swore that: "Pemberton stated he does regularly sell marijuana." *Id*.  This attestation can be juxtaposed against the body camera recording, which shows Mr. Pemberton actually stating that, if he was "going to sell something," it would be marijuana.  Gov't's Opp'n 4–5 (quoting the transcribed conversation).  Second, in describing the believed need to search the home, Officer Granville asserts:  "Officer [sic] have yet to locate a firearm inside the residence during the initial investigation alleged to be used in the brandishing during the domestic assault."  Residential Warrant 5.  Notably, Officer Granville did not mention what had already been recovered in the backyard:  the handgun, backpack, and the bricks of fentanyl/cocaine.  *Id.*

2. Phone Search Warrant Contents

The phone search warrant affidavits request permission to search the phones for evidence of controlled substance distribution and firearm possession.  Black Phone Warrant 1; Purple Phone Warrant 1.  The phone warrants are identical to each other aside from the description of the phones, Purple Phone Warrant 1 ("The phone is an iPhone in a clear and glitter case"); Black Phone Warrant ("The cell phone is a black iPhone in a black case"), and a written addendum to the Black Phone Warrant Probable Cause Statement, which states: "Both phones were in Ms. McLeod's possession at the time of recovery from the dining room table," Black Phone Warrant 6.   Both

warrants authorize officers to search "a cellular phone recovered *belonging to Dajour Dominique Pemberton*." Black Phone Warrant 1; Purple Phone Warrant 1 (emphasis added).

To demonstrate probable cause, the affiant officer—here, Officer Hopkins—described the recovered 9mm cartridge, the "black Glock 9mm" found in the backyard, as well as the backpack and its contents: "$3005 US currency, a digital scale with marijuana residue, packaging material, and approximately 500 grams suspected cocaine and 680 grams of heroin.  The backpack also had marijuana residue throughout and a gallon sized vacuum sealed bag with marijuana residue." Black Phone Warrant 5–6; Purple Phone Warrant 5–6.  Officer Hopkins also describes Mr. Pemberton's footprints leading to the backyard: "Officer Hopkins observed male sized shoeprints leading from the rear glass sliding door to the edge of the porch. . . .  The shoe print appeared to match the slip on shoes Pemberton was wearing."  Black Phone Warrant 4; Purple Phone Warrant 4.  Like the residential search warrant affidavit, Officer Hopkins also includes the misdescription of Detective Stewart's conversation with Mr. Pemberton, stating:  "Pemberton denied any involvement with cocaine or heroin but stated he does regularly sell marijuana."  Black Phone Warrant 5; Purple Phone Warrant 5.

Finally, Officer Hopkins asserted that, based on his own experience, he believed that the phones would contain evidence of narcotic distribution.  Specifically, he stated:

> The affiant is aware through hundred [sic] of narcotics related investigation and criminal debriefs, that the [amount of drugs found] is not consistent with personal use and is indicative of the sale of the before mentioned controlled substance. . . .  He is also aware that those who participate in the sale of controlled substances will use cell phones to exchange information with [others] regarding the sale and purchase of said controlled substances. . . .  This combined with [the] statements from Pemberton about regularly selling marijuana, leads the affiant to believe it is probable that additional information regarding the items located will be on Pemberton's phone."

6

Black Phone Warrant 5; Purple Phone Warrant 5.  Notably, both affidavits specify that such information will likely be located on Mr. Pemberton's phone—neither mention Ms. McCleod's.  *See* Black Phone Warrant 5; Purple Phone Warrant 5.

### C. *Franks* Hearing

The Defendant filed a motion to suppress the evidence resulting from the residential search warrant and the purple phone warrant.  *See generally* Mem. Supp.  Invoking *Franks v. Delaware*, 438 U.S. 154 (1974), the Defendant requested an evidentiary hearing regarding three misleading aspects of the affidavits:  the exaggeration of Mr. Pemberton's marijuana statement, the omission of the recovered firearm, and the assertion that Ms. McLeod's purple phone belonged to Mr. Pemberton.  The Court held a *Franks* hearing on October 31, 2024.  There, the Court heard testimony from Newport News Police Officers Granville, Hopkins, and McKay, as well as from Detective Stewart[5] and Vestor McLeod, the Defendant's mother.

The officers' and Detective Stewart's testimony illuminated for the Court the context in which the affidavits were prepared.  Collectively, this testimony clarified three relevant points.  As to the exaggerated marijuana statement, the testimony revealed that Detective Stewart did not directly communicate with either of the affiant officers about his conversation with Mr. Pemberton.  Rather, Officers Granville and Hopkins learned about the interview second- or third-hand.  While neither could identify by whom, both officers testified they had been told that Mr. Pemberton had admitted to "regularly selling" marijuana in his interview with Detective Stewart, and that they had no reason to question such an assertion.  Detective Stewart's testimony confirmed that he had

---

[5] Stewart now works for Homeland Security Investigations as a Task Force Officer and is no longer employed by NNPD.  For ease of reference, however, the Court continues to refer to him according to his NNPD title, Detective Stewart.

7

not spoken to either affiant.  The Court found this aspect of their testimonies credible and accepts it as true.

Second, as to the omitted handgun, Officer Granville testified that he did not include the firearm, drugs, or backpack in the residential search warrant affidavit because he understood the investigation resulting from the 911 call and the investigation into the drugs and firearm as two parallel but distinct investigations.  Thus, he did not think to include the firearm—which was part of the narcotics investigation—in the residential search warrant for the brandishing allegation.  The Court found this testimony credible as well and accepts it as true.

Finally, as to the false assertion that Mr. Pemberton owned the purple phone, Officer Hopkins admitted that he swore that the purple phone belonged to Mr. Pemberton despite not knowing the identity of its owner.  Counsel for the Defendant accused Officer Hopkins of knowing that the purple phone actually belonged to Ms. McLeod, which Officer Hopkins denied.  He admitted, however, that he was aware Ms. McLeod lived in the house and that he was present when she stepped outside with the purple phone to her ear.  However, aside from this circumstantial evidence, the Defendant was unable to provide any affirmative evidence that Officer Hopkins was subjectively aware of the phone's owner.[6]  Accordingly, the Court is convinced that the most that can be said is that Officer Hopkins swore that the purple phone belonged to Mr. Pemberton despite having no grounds to do so.  The Court does not find that the testimony established that Officer

---

[6] Defense counsel also sought to impeach Officer Hopkins by calling the Defendant's mother, Vestor McLeod, to testify.  The Defendant's mother testified that she had found Officer Hopkins's name on a warrant in Defendant McLeod's home and, relying on the warrant, had asked for him at the police station to discuss how she might retrieve her daughter's phone.  Despite the confidence the Defendant's mother presented on the stand, the Court does not find her testimony credible and suspects she may have confused Officer Hopkins with another police officer.  Officer Hopkins swore out the phone warrants, not the residential warrants.  Additionally, counsel did not establish— and the Court is not otherwise aware of—any reason why the phone warrants would have been left at the residence.

8

Hopkins swore that the phone belonged to Mr. Pemberton despite affirmatively knowing that it in fact belonged to Ms. McLeod.

## II. LEGAL STANDARD

"'An accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit' by way of a motion to suppress." *United States v. Pulley*, 987 F.3d 370, 379 (4th Cir. 2021) (quoting *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011)). However, under *Franks v. Delaware*, 438 U.S. 154 (1974), a defendant may suppress the fruits of such a warrant by demonstrating that the affiant officer made a material misrepresentation in the underlying warrant and by establishing, by a preponderance of the evidence, that the officer included the misrepresentation with the subjective intent to mislead the magistrate, or with a reckless disregard for the truth. *Franks*, 438 U.S. at 155–56. Reckless disregard "requires a showing that the affiant personally recognized the risk of making the affidavit misleading." *Pulley*, 987 F.3d at 377. Conversely, exclusion is inappropriate where "police have been merely negligent in checking or recording the facts relevant to a probable cause determination." *Franks*, 438 U.S. at 170.

The Fourth Amendment requires each search warrant to be supported by probable cause, which is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 US 213, 238 (1983). "This fair probability is the kind of probability 'on which reasonable and prudent people, not legal technicians, act.'" *United States v. Manafort*, 323 F. Supp. 3d 795, 801–02 (E.D. Va. 2018) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). At bottom, probable cause is a flexible, non-technical standard. *Taylor v. Farmer*, 13 F.3d 117, 121–22 (4th Cir. 1993). "Officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search

9

or seizure will present a triable issue of probable cause." *Id.* Probable cause is often based on "common-sense conclusions about human behavior." *Gates*, 462 U.S. at 231–32.

### III. ANALYSIS

**A. Residential Search Warrant**

In her briefing and at the hearing, the Defendant first attacked the residential search warrant by arguing that Officer Granville, the affiant officer, included material misrepresentations in the affidavit underlying the search warrant. Invoking the *Franks* standard, the Defendant takes issue with two aspects of the residential search warrant: Officer Granville's exaggeration of Mr. Pemberton's marijuana statement to Detective Stewart, and Granville's failure to mention the recovered firearm in the backyard. Because neither aspect is material to probable cause, both arguments are unavailing.[7]

<u>1. Exaggeration of Mr. Pemberton's Statements</u>

As described above, when accused of selling cocaine and heroin, Mr. Pemberton stated: "If I'm going to sell something, to keep it real with you, if I'm going to sell something, it's some f****ing weed." Gov't's Opp'n 4–5. Yet, in his affidavit, Officer Granville describes Mr. Pemberton's statement as being that "he does regularly sell marijuana." Residential Warrant 5. The discrepancy between the two are clear and constitute the kind of "objective[] fals[ity]" that implicates *Franks*. *Moody*, 931 F.3d 366, 370 (4th Cir. 2019). However, to receive the *Franks* suppression remedy, the Defendant must still demonstrate that this exaggeration was either intentional or reckless, and material to probable cause. *Franks*, 438 U.S. at 155–56.

---

[7] The Defendant also asserts without explanation that all three warrants are overbroad and lack particularity. *See* Mem. Supp. 11. Because these assertions appear to be a form argument unsupported by any application of fact or by any argument at the hearing, and because the scope of the warrants do not give the Court pause, the Court does not engage with them.

10

*a. Intentionality*

As described above, the November 4 hearing illuminated the disjointed manner in which the officers conveyed to one another the facts creating probable cause. Officer Granville, who swore out the warrant relevant here, did not speak directly to Detective Stewart about his interview with Mr. Pemberton. Rather, Officer Granville described on the stand how he spoke to multiple officers about the interview. He could not recall which officers in particular, but he testified that one of those intermediary officers had informed Officer Granville that Mr. Pemberton had admitted to regularly selling marijuana. Accordingly, the relevant question is whether Officer Granville included the misrepresentative, exaggerated marijuana statement with the requisite intent under *Franks*.

Importantly, the *Franks* standard only considers the subjective intent of the affiant officer. *Pulley*, 987 F.3d at 380; *United States v. Haas*, 986 F.3d 467, 477 (4th Cir. 2021) (declining to accept a "reasonable officer" standard). Thus, a successful *Franks* movant must demonstrate that the *affiant officer* subjectively intended to mislead the magistrate, or at least acted in reckless disregard of the truth. *Franks*, 438 U.S. at 170. Despite the concerningly disorganized manner by which the Newport News police prepared this affidavit, the testimony does not support a finding that Officer Granville knew the statement was exaggerated. Rather, the evidence demonstrates that Officer Granville relied on the reports of his fellow officers. Absent a particular reason to doubt those reports, the Fourth Amendment does not require that he verify them. *See United States v. Shelton*, 196 F. App'x 220, 221 (4th Cir. 2006) (affirming an officer's reasonable reliance on a known informant in preparing a warrant affidavit); *United States v. Reed*, 726 F.2d 339, 342 (7th Cir. 1984) (applying the *Franks* standard and determining that an officer's failure to verify

apparently reliable information did not amount to reckless disregard of the truth). Therefore, the Court cannot conclude that Officer Granville possessed the requisite intent under *Franks*.

### b. Materiality

To satisfy the materiality prong, a defendant must show that the false statement was necessary for a finding of probable cause. *Franks*, 438 U.S. at 156. In other words, if probable cause still exists "with the affidavit's false material set to one side," the defendant has not met the *Franks* standard, and the fruits of the search need not be excluded. *Id.* Thus, the question here is whether the residential search warrant would be supported by probable cause even if Officer Granville had included Mr. Pemberton's actual marijuana statement.[8]

In this case, even Mr. Pemberton's actual statement creates probable cause to search the Creekshire address for evidence of drug distribution.[9] Courts have frequently recognized that statements against pecuniary interest "carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *Harris*, 403 U.S. at 583. Here, Mr. Pemberton's statement implies that he distributes marijuana, which is certainly against pecuniary interest. *See* Gov't's Opp'n 4–5. Inferring actual drug distribution from this statement is a "common-sense conclusion[] about human behavior": innocent people do not imply that they sell marijuana to officers interviewing them about suspected drug distribution. Thus, Mr. Pemberton's statement

---

[8] Ms. McLeod asserts that the *Franks* analysis requires the Court to totally discard the exaggerated, misrepresentative statement. Mem. Supp. 11. This assertion is incorrect. Rather, the Court should test for probable cause as if the affiant officer had included Mr. Pemberton's *actual* statement.

Admittedly, there is no express Fourth Circuit law on this issue. However, the logic of previous cases supports this understanding of the *Franks* analysis. For example, when considering whether omitted evidence was material to a finding of probable cause, the Fourth Circuit directed district courts to consider the affidavit as if the omitted evidence—the "truth"—*had* been included. *See United States v. Lull*, 824 F.3d 109, 117–18 (4th Cir. 2016). Logically, then, in the case of exaggerations, district courts should replace such statements with more accurate representations. Then, based on the accurate representation, the Court can perform the *Franks* materiality analysis.

[9] Because Officer Granville omitted the recovered backpack, drugs, and handgun from the affidavit, probable cause to search for drugs must rely on Mr. Pemberton's statements alone.

was "sufficient to warrant a man of reasonable prudence in the belief" that Mr. Pemberton did, in fact, sell marijuana. *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

To adequately support a search warrant, an affidavit must also demonstrate probable cause that "contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. In other words, there must be a sufficient nexus between the place to be searched and the crime alleged. *See id.* However, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such items." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). While Mr. Pemberton's statement does not expressly connect any drug distribution to his home, "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key." *United States v. Grossman*, 400 F.3d 212, 217–18 (4th Cir. 2005). Mr. Pemberton's residence at the Creekshire address and the natural inferences which arise from his statement create a "fair probability" that Mr. Pemberton actually sold marijuana and that evidence of his distribution would be found in the home. *Gates*, 462 U.S. at 238.

As a result, the Defendant has failed to demonstrate that Officer Granville's inclusion of the exaggerated statement was material to probable cause, and she has therefore failed to satisfy the *Franks* test for suppression based on such exaggeration.

2. Omission of Firearm

Next, the Defendant argues that Officer Granville's failure to include the recovered firearm in the affidavit is itself a material misrepresentation. Omissions of relevant facts in a warrant affidavit may result in suppression under *Franks*. *United States v. Colkey*, 899 F.2d 297, 301 (4th Cir. 1990). However, "[t]he mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit." *Id.* (quoting *United States v. Burnes*, 816 F.2d 1354,

13

1358 (9th Cir. 1987). An omission triggers the *Franks* suppression remedy only when the omission was "designed to mislead" or "made in reckless disregard of whether they would mislead the magistrate." *Id.*

### a. Intentionality

To satisfy the intentionality prong here, the Defendant must show that Officer Granville omitted the recovered firearm from the residential search warrant affidavit to mislead the magistrate, or with reckless disregard as to the risk of misleading the magistrate. *Id.* As described above, however, Officer Granville testified that the brandishing investigation and the narcotics investigation were separate. Thus, while he was aware that officers had recovered a firearm from behind the Creekshire residence, he perceived it as tied to the narcotics investigation, of which he was not a member. He admitted that the recovered firearm could have been the same firearm Mr. Pemberton allegedly used against Ms. McLeod, however, he maintained that officers at the scene had limited knowledge of the recovered firearm and its role in the alleged brandishing. Accordingly, it was just as likely that there was still a firearm in the house to be found. The Court finds this testimony credible and therefore concludes that Officer Granville did not omit the recovered firearm from the affidavit with the intent to mislead or in reckless disregard of the risk of misleading the magistrate. The Defendant's argument to that effect is unavailing and fails to satisfy the *Franks* standard.

### b. Materiality

Intentionality aside, the Defendant fails again on the materiality prong. Even if the recovered handgun had been included in the affidavit, the Court is persuaded that a "substantial chance" still existed that additional handguns would be found inside the Creekshire address. Given Ms. McLeod's 911 call, upon their arrival, officers believed a gun had recently been present in the

home. *Id.* The recovered handgun, however, was a fair distance from the home and partially buried in the ground. *Id.* at 3. While it is reasonable to believe that Mr. Pemberton discarded the weapon once police were called, it is equally reasonable to believe that it is a separate weapon altogether. When facts create inferences supporting a search as well as inferences that do not, neither officers nor magistrates are required to only draw the inference that favors the suspect. *See D.C. v. Wesby*, 583 U.S. 48, 61–62 (2018) (officers are not required "to rule out a suspect's innocent explanation for suspicious facts" before they are able to conclude probable cause exists). Thus, a "fair probability" existed that the gun used to threaten Ms. Pemberton was still in the home, creating probable cause to search. *See Gates*, 462 U.S. at 238.

This probability is increased by Mr. Pemberton's known criminal history. Residential Warrant 5. The probable cause analysis may legitimately include a consideration of the accused's relevant criminal history. *United States v. Melvin*, 419 F.2d 136, 141 (4th Cir. 1969); *United States v. Nelson*, 535 F. Supp. 3d 529, 533 (S.D.W. Va. 2021). As described above, and as described to the magistrate, Mr. Pemberton's criminal history includes multiple firearms charges, including possession of a weapon by a felon. Residential Warrant at 5. While a history of criminal firearm possession does not in and of itself prove that, at the time police were called, Mr. Pemberton possessed multiple weapons, it does heighten the probability that more weapons and ammunitions could yet be recovered.

Finally, to the extent one can infer drug distribution from Mr. Pemberton's marijuana statement, the "settled connection between firearms and drug activities" further heightens the likelihood that the house would contain firearms and ammunition. *United States v. Manigan*, 592 F.3d 621, 629–30 (4th Cir. 2010); *see also United States v. Perry*, 560 F.3d 246 (4th Cir. 2009) (holding that "the well-known and attested-to link between drug distribution and firearms" created

15

probable cause to search for firearms where there was probable cause to search for evidence of drug distribution). Because firearms are the "tools of the drug trade," *United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999), *cert. denied*, 528 U.S. 855 (1999), the fact that Mr. Pemberton had arguably admitted to marijuana distribution creates further basis "to warrant a man of reasonable prudence in the belief" that additional firearms and ammunition would be found in the home. *Ornelas*, 517 U.S. 690, 696 (1996). Taken together, the totality of the circumstances created probable cause to search the Creekshire address for additional weapons and ammunition.

As a result, beyond an apparent lack of requisite intent by Officer Granville, probable cause is unaffected by his omission. Accordingly, the Defendant's attempts to suppress the fruits of the residential search are unavailing.

## B. Phone Search Warrant

The Defendant argues, and the record supports, that the only statements in the affidavit creating probable cause to search the phones were: (1) Officer Hopkins's sworn belief that those who distribute drugs use phones to do so, Purple Phone Warrant 5; (2) the phones' proximity to the drugs recovered from behind the residence, *id.*; and (3) the phones' possession by Mr. Pemberton, who had implicated himself in drug distribution in his conversation with Detective Stewart, as analyzed *infra*.[10]

The Defendant takes issue with the warrants on two grounds. First, she argues that there was no factual support for probable cause because there are no facts connecting these particular

---

[10] The Defendant also notes that the phone warrant affidavits mirror the residential search warrants in that they include an exaggerated version of Mr. Pemberton's marijuana statement. However, the analysis applied *infra* results in the same conclusion here: Notwithstanding the exaggeration, the actual statement is one against pecuniary interest which a reasonable officer could understand to be an admission to drug distribution. Further, unlike the residential search warrants, the phone warrant affidavits included the fact of the recovered backpack, drugs, and handgun. Therefore, the fact that Officer Hopkins may have exaggerated about Mr. Pemberton's marijuana statement tends to affect the phone search warrants even less than it does the residential search warrant. As described *supra*, notwithstanding any exaggeration, the phones were still proximate to a backpack full of drugs and inside a home occupied by a man who had implied that he distributes drugs. This is sufficient to support probable cause.

phones to evidence of criminality. Mem. Supp. 11–12. Second, she argues that, to the extent that the phones' connection to Mr. Pemberton created probable cause to search the phones, that probable cause should not reach the purple phone, since the purple phone was, in fact, Ms. McLeod's. *Id.* The Defendant invokes the *Franks* standard and argues that Officer Hopkins intentionally deceived the magistrate regarding the ownership of the purple phone. *Id.* Neither argument succeeds, however, because the phones' proximity to evidence of drug distribution alone creates probable cause. Because the *Franks* issue gives opportunity to resolve both arguments, the Court considers it first below.

### 1. *Franks* Argument Regarding Purple Phone's Ownership

Here, the Defendant argues that Officer Hopkins intentionally misled the magistrate by stating that the purple phone was a "cellular phone . . . *belonging to* Dajour Dominique Pemberton," Purple Phone Warrant 5 (emphasis added), when in fact the phone belonged to Ms. McLeod. *See* Mem. Supp. 11–12. The Court finds that Officer Hopkins recklessly disregarded the truth by asserting a fact about which he had no actual knowledge. The Defendant fails again, however, to demonstrate that the purported deception is material to probable cause. Therefore, *Franks* does not mandate suppression of the phone search warrant.

#### a. Intentionality

The Defendant argued, in her briefing and at the hearing, that Officer Hopkins subjectively knew that the purple phone was Ms. McLeod's but deliberately and knowingly asserted that the phone belonged to Mr. Pemberton. The government contended that Officer Hopkins could not have known the ownership of either phone, since Ms. McLeod carried both from the house and initially told officers both were hers. Gov't's Opp'n 7–8. The Government did concede, however,

17

that Officer Hopkins should not have represented to the magistrate that both were Mr. Pemberton's if he had no such knowledge. *Id.* at 14.

The evidence shows that, at most, Officer Hopkins had no knowledge of the phone's ownership, despite swearing that it belonged to Mr. Pemberton. One strains to imagine a more flagrant disregard for the truth than asserting under oath a fact about which one has no knowledge. This disregard is made clearer by the circumstantial evidence of the phone's ownership, most notably, the commonsense inference that the black phone belonged to the home's male resident, and the purple phone in the sparkly case belonged to the female resident. Officer Hopkins' unfounded, sworn assertion to the contrary would have required Officer Hopkins to "personally recognize[] the risk of making the affidavit misleading," particularly in light of the available evidence. *Pulley*, 987 F.3d at 377. Accordingly, the Court finds that Officer Hopkins acted in reckless disregard of the truth by asserting that the purple phone belonged to Mr. Pemberton, satisfying the first *Franks* prong.

### b. Materiality

The second *Franks* element questions the materiality of the misrepresentation. As described *supra*, if probable cause still exists "with the affidavit's false material set to one side," the defendant has not met the *Franks* standard, no hearing is warranted, and the fruits of the search need not be excluded. *Franks*, 438 U.S. at 156.

Setting aside Officer Hopkins's assertion that the purple phone "belong[ed] to" Mr. Pemberton, there are three remaining facts supporting probable cause: (1) Officer Hopkins's "aware[ness] that those who participate in the sale of controlled substances will use cell phones to exchange information . . . regarding the sale and purchase of said controlled substances," Purple Phone Warrant 6; (2) the phone's proximity to the large amount of drugs recovered in the backyard,

as well as the footprints showing someone from inside the Creekshire address had discarded said drugs, Purple Phone Warrant 5–6; and (3) Mr. Pemberton's residence in the home where the phones were located, coupled with his marijuana statement. *See id.*

Here, despite the reckless misrepresentation, Officer Hopkins's assertion that the purple phone "belong[ed] to Dajour Dominique Pemberton" was not material to probable cause. "A number of decisions have concluded that probable cause to search a cell phone exists simply because cell phones discovered in proximity to crime or contraband almost invariably contain incriminating evidence." *United States v. Harris*, 2016 WL 1441382, at *11 (E.D. Va. Apr. 11, 2016) (citing, *e.g.*, *United States v. Pineda*, 999 F. Supp. 2d 982, 989 (M.D. Tenn. 2014); *United States v. Reed*, 2013 WL 5503691 (D. Vt. Oct. 2, 2013)), *aff'd*, 688 F. App'x 223 (4th Cir. 2017). "These decisions are pertinent here, not because of the legal proposition on which they are based, but because they reflect factual findings that are consistent with the experience of the law enforcement officers as set out in this record." *Id.*

As noted by Officer Hopkins in his affidavit, "cell phones found near illegal activity are highly likely to contain incriminating evidence." *Id.* Even if Officer Hopkins had correctly identified Ms. McLeod as the phone's owner in the affidavit, there would still be a "fair probability" that evidence of drug distribution would be on her phone. *Gates*, 462 U.S. at 238. Notwithstanding its ownership, the purple phone was located in the home where Mr. Pemberton resided and proximate to the large quantity of drugs recovered in the backyard. *See* Purple Phone Warrant 5–6. When combined with "the affiant's knowledge, based on training and experience, that cell phones are tools of the drug trade," *United States v. Worthy*, 2019 WL 1441172, at *1 (D. Md. Apr. 1, 2019), the uncontroverted sworn facts are "sufficient to warrant a man of reasonable prudence in the belief" that evidence of drug distribution would be found on the purple phone in

19

addition to the black phone. *Ornelas*, 517 at 696. Thus, Officer Hopkins's false assertion of ownership in the affidavit is immaterial. The Defendant has failed to satisfy the second prong of *Franks* and as such, suppression is not appropriate. *See Franks*, 438 U.S. at 171.

### 2. Lack of Probable Cause

The Defendant additionally argues that, without a specific nexus between the phones and the evidence of criminality, the phone search warrant lacks probable cause. Mem. Supp. 10–12. Citing to *Riley v. California*, 573 U.S. 373, 393 (2014), the Defendant argues that phone search warrants deserve heightened scrutiny, given cell phones' central role in modern private life. As described *supra*, however, the phone's proximity to the drugs and Mr. Pemberton, combined with "the affiant's knowledge, based on training and experience, that cell phones are tools of the drug trade," constitute a particularized nexus creating probable cause to search both phones for evidence of drug distribution. *Worthy*, 2019 WL 1441172, at *1. Thus, this argument is unavailing. Both phone search warrants are appropriately supported by probable cause. The Defendant's attempts to suppress the fruits of the phone search warrants fail.

### IV. CONCLUSION

None of the Defendant's arguments meet the standard required to merit suppression. While all three warrant affidavits include some level of misrepresentation, each misrepresentation is ultimately immaterial, and each warrant was adequately supported by probable cause. Therefore, notwithstanding the concerning evidence presented regarding the preparation of the instant warrants, the Court denies the Motion. The evidence resulting from the warrants will not be suppressed. An appropriate Order will accompany this Memorandum Opinion.

Date: <u>November 12, 2024</u>
Richmond, Virginia

/s/ *RCY*
Roderick C. Young
United States District Judge